IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

June 5, 2013
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Nos. 12-1178 and 12-1186

In Re: LILITH H., WYLLOW H., and NATALIE H.

Appeal from the Circuit Court of Gilmer County
The Honorable Jack Alsop, Judge
Case Nos. 11-JA-14, 11-JA-15, and 11-JA-16

REVERSED AND REMANDED WITH DIRECTIONS

Submitted: May 15, 2013
Filed: June 5, 2013

Daniel R. Grindo, Esq.
Law Office of Daniel R. Grindo, PLLC
Gassaway, West Virginia
Attorney for Petitioner April B.

Patrick Morrisey, Esq.
Attorney General
Lee Niezgoda, Esq.
Assistant Attorney General
White Hall, West Virginia
Counsel for DHHR

Christina C. Flanigan, Esq.
Law Offices of Nanners & Willett, L. C.
Buckhannon, West Virginia
Attorney for Petitioner Matthew H.

Shelly DeMarino, Esq.
Shelly DeMarino, PLLC
Glenville, West Virginia
Guardian *ad Litem* for Lilith H.,
Wyllow H. and Natalie H.

The Opinion of the Court was delivered PER CURIAM.

1.      "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.      "W. Va. Code, 49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent."  Syl. Pt. 3, *In re Betty J.W.*, 179 W. Va. 605, 371 S.E.2d 326 (1988).

3.      "In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant

child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syl. Pt. 1, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

4. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

5. "Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the . . . case [will be] remanded for compliance with that process[.]" Syl. Pt. 5, in part, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001).

6. "To facilitate the prompt, fair and thorough resolution of abuse and neglect actions, if, in the course of a child abuse and/or neglect proceeding, a circuit court discerns from the evidence or allegations presented that reasonable cause exists to believe that additional abuse or neglect has occurred or is imminent which is not encompassed by the allegations contained in the Department of Health and Human Resource's petition, then pursuant to Rule 19 of the *Rules of Procedure for Child Abuse and Neglect*

*Proceedings* [1997] the circuit court has the inherent authority to compel the Department to amend its petition to encompass the evidence or allegations." Syl. Pt. 5, *In re Randy H.*, 220 W. Va. 122, 640 S.E.2d 185 (2006).

7. "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948).

8. "In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child." Syl. Pt. 6, *In re: Timber M. and Reuben M.*, No. 12-1138 (W. Va. June 5, 2013).

9. "Where a trial court order terminating parental rights merely declares that there is no reasonable likelihood that a parent can eliminate the conditions of neglect, without explicitly stating factual findings in the order or on the record supporting such conclusion, and fails to state statutory findings required by West Virginia Code § 49–6–5(a)(6) (1998) (Repl. Vol. 2001) on the record or in the order, the order is inadequate." Syl. Pt. 4, in part, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001).

Per Curiam:

Petitioners/respondents below, Matthew H. and April B., challenge the Circuit Court of Gilmer County's October 3, 2011, and September 12, 2012, orders adjudicating them abusive and neglectful and terminating their parental rights, respectively, to Lilith H., Wyllow H., and Natalie H. in this consolidated appeal. Petitioners assert that the circuit court erred in finding that an altercation involving Matthew H. and April B.'s father, which was witnessed by the children, constituted abuse and/or neglect and further that the circuit court erred in terminating their parental rights following what they contend was a successful completion of their respective improvement periods.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the circuit court erred in adjudicating Matthew H. and April B. abusive and neglectful and in terminating their parental rights on the basis of allegations which were not the subject of the adjudication. Therefore, we reverse the circuit court's adjudication and subsequent disposition and remand this case for further proceedings, as appropriate, consistent with this opinion.

# I. FACTS AND PROCEDURAL HISTORY

On August 6, 2011, a physical altercation occurred between petitioner Matthew H. and Randy B.,[1] petitioner April B.'s father, at petitioners' home; the home was owned by Randy B., but petitioners were living there. Randy B. was riding past the home on an ATV when Matthew H. made an obscene gesture toward him. Randy B. stopped his ATV and approached Matthew H. and a verbal argument ensued, followed by an exchange of blows. It is unclear who threw the first punch; however, the parties indisputably engaged in mutual combat. Randy B. admitted to choking Matthew H., who was later diagnosed with a fractured eye socket. At the time the altercation began, petitioner April B. was inside the house with the children, Lilith H., Wyllow H., and Natalie H.[2] As the altercation progressed, April B. came out of the house to attempt to intervene; she then also became involved in the physical altercation and struck her father. At some point during April B.'s involvement in the altercation--whether simultaneously with or subsequent to is unclear--the three children also came outside and observed the altercation. Matthew H. then threatened to get a gun and went into the house; Randy B. left and Matthew H. alleges that Randy B. also threatened to return with a gun. Witnesses indicated that Matthew H. then emerged from his house with his hands behind

---

[1] We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties. *See*, e.g., *West Virginia Dept. of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

[2] The children were ages 5, 7, and 8, respectively, at the time of the altercation.

his back as though he had a weapon, but there is no evidence that he actually obtained a weapon. The police were called to the scene and domestic battery charges were filed against Matthew H., April B., and Randy B. Notably, April B. immediately filed a domestic violence petition against her father, Randy B.

The Department of Health and Human Resources (hereinafter "DHHR") filed an abuse and neglect petition on August 10, 2011, alleging that there existed "an imminent danger to the children's physical well being" inasmuch as they "witnessed their father and grandfather fighting and punching each other" and "their father and grandfather have both threatened to shoot each other." As to April B., the petition alleged that she "appear[ed] emotionally and mentally unable to protect the children." The petition further alleged that the children "had head lice, and fleas upon their person. Their clothing and bodies were dirty and the body odor indicated poor hygiene."[3] Finally, the petition also noted that the petitioners had been investigated twice previously—in January, 2007, and May, 2011--but that "no abuse or neglect was substantiated."

---

[3] These allegations were apparently not substantiated inasmuch as the case worker who filed the petition testified that the children "were not so filthy as to seem neglected." Further, no witness testified to seeing fleas upon the children, and the case worker was uncertain whether the children actually had head lice. Moreover, as discussed more fully *infra*, although there was testimony about the cleanliness of the home in which the children were living at the time of the altercation, no such allegations were ever made part of the petition, nor were they identified as part of the basis of the circuit court's adjudication or disposition.

At the preliminary hearing on August 18, 2011, the investigating officer testified consistent with the above version of events, but noted that there had been previous altercations between Matthew H. and Randy B. involving gun threats. When he served the criminal complaint on Matthew H., he noted that there were "animals everywhere," flies and gnats in the house around the lights, and the floor was dirty. He observed no food lying around, but characterized the house as "disgusting." The DHHR caseworker who filed the petition testified that during her initial home visit subsequent to the petition, she observed many exotic and other animals,[4] noted the home was "cluttered," a trash can overflowing, dishes with rotting food on them in the sink, as well as an odor. Although she did not include the condition of the home in her petition because she had not yet been there at the time of filing, she testified she thought it was serious enough to include. However, the record reveals no formal amendment of the petition to include the condition of the home.

The circuit court found that sufficient imminent danger existed such as to remove the children from the home and ordered petitioners to undergo psychological evaluations; they were granted six hours of unsupervised visitation every weekend. The court predicated its ruling on the "domestic violence" which occurred in front of the

---

[4] The worker testified that she observed an alligator, four to five chinchillas, fifteen to twenty aquariums full of rats, an iguana, a toucan, a snake, a spider, a lizard, and an inside dog.

4

children, rejecting Matthew H.'s argument that the underlying cause of the violence had been addressed by virtue of the domestic violence petition filed against Randy B.

On September 1, 2011, an adjudication hearing was held during which the court heard testimony from various witnesses regarding the altercation, including Randy B., who testified consistent with the facts noted above, adding that 1) the verbal altercation began because he was evicting petitioners from the home effective August 23; and 2) he and Matthew H. had a history of verbal altercations and threats. Notably, no testimony was adduced regarding the condition of the children, the home, or any issues between April B. and Matthew H. and the circuit court made no reference to any such issues in its oral findings or order. Nonetheless, the circuit court adjudicated the children abused and neglected, finding that Matthew H. "had an altercation . . . with the maternal grandfather and threatened to get a firearm in the presence of the Infant respondents" and April B. "failed to protect the Infant Respondents."[5] The circuit court granted six hours a week supervised visitation because the guardian ad litem expressed concerns that the children were being "coached" and that the case was being discussed with them.

---

[5] During its ruling, although not contained in the adjudication order, the circuit court stated that April "failed to take appropriate action to protect the health, safety and welfare of the children by *bringing them to the scene* where this altercation was occurring[.]" (emphasis added). As indicated above, the undisputed testimony indicates that the altercation took place outside the petitioners' home, from which petitioners contend the children emerged unbeknownst to anyone, during the course of the altercation.

Subsequent to the adjudication, the guardian ad litem filed a motion to compel the DHHR to amend its petition or file a new one to include allegations regarding the condition of the children and home. At a hearing on the motion on September 22, 2011, the guardian ad litem argued that she had interviewed the children, who noted that they did not like foster care because they had to bathe every day. She testified that the children stated that they did not previously bathe every day because their mother had to heat the water on the stove. The guardian ad litem further represented that she had visited the home and taken photos a few days after the family moved out, noting that the condition of the home was "very, very poor."

The circuit court ruled that since adjudication had already occurred, the petition could not be amended to include new allegations, but all parties agreed that the court could consider the condition of the home for purposes of disposition.[6] As such, the

---

[6] The court stated,

> the Court is of the opinion that any relevant information as to the condition of the home, as to conditions that need to be addressed, can be presented at the dispositional hearing, and neither the State of West Virginia nor the Guardian Ad Litem would be prohibited from submitting evidence in regards to these alleged deficiencies. *I don't think we're limited to the deficiencies outlined in the petition for adjudication or the time before this adjudication.* As it comes to disposition I think the Court can and the Court will address all deficiencies out of which this case arises.

(emphasis added). Although petitioners' respective counsel objected to the motion to compel, they agreed that allegations regarding the home and children could be considered (continued . . .)

6

State called the DHHR caseworker, who testified that the residence did not appear to be a safe, fit, and habitable place for the children to reside, but noted further that the petitioners had subsequently moved into a residence she had not inspected. Nevertheless, she recommended an improvement period for petitioners.

As a result of the foregoing testimony, the court "reluctantly" granted a six-month post-adjudicatory improvement period to include a substance abuse evaluation,[7] drug counseling, anger management, individual and family counseling, batterers' counseling, and parenting classes. On March 12, 2012, petitioners were granted a ninety-day extension of their improvement period. On June 11, 2012, the court changed visitation to two, four-hour supervised visits per week due to reports that the parents were "still arguing and did not disclose to the MDT team that they were getting evicted"; the court further found that the petitioners were "blaming and threatening everyone involved

by the court at disposition and were prepared to go forward with the hearing. This ruling was not assigned as error in this appeal. However, as discussed *infra,* neither the condition of the children nor the home ultimately formed the basis of the court's disposition, based on the order and transcript.

[7] Evidence was adduced during the September 22, 2011, hearing regarding Matthew H.'s positive drug test at the preliminary hearing; he tested positive for THC and proxyphene, a narcotic pain reliever. April B.'s drug test was negative. However, the substance abuse evaluation apparently revealed that petitioners had no substance abuse issues and therefore, services were unnecessary in that regard. During oral argument, however, counsel represented that post-termination visitation was recently suspended, in part, due to Matthew H. testing positive for methamphetamine.

7

in the case rather then [sic] taking responsibility for their own actions and behaviors."

The court then set the case for disposition.

On August 30, 2012, the court held a dispositional hearing and terminated the petitioners' parental rights. The court heard testimony from a variety of service providers, whose testimony centered exclusively around the allegedly contentious relationship between April B. and Matthew H.[8] No testimony was adduced regarding the relationship between Matthew H. and Randy B., the condition of the children, or the home. With the exception of seven batterers' intervention classes out of a total thirty-two classes required, the witnesses testified that petitioners completed all aspects of their

---

[8] In particular, the court heard testimony from April B.'s counselor, who testified that Matthew H. was "mentally and verbally abusive" to April B. when he was not taking his medications and "says mean and hurtful things to her" and "calls her names to the girls." The counselor further testified, however, that she thought that since Matthew H. had recently obtained employment, it was likely that the "psychological abuse" would cease. A co-worker of April B. further testified about an incident which occurred just prior to the hearing where Matthew H. showed up at April B.'s workplace, raising his voice to her and attempting to confront her regarding what Matthew H. described as allegations that April B. had been unfaithful to him.

Matthew H.'s therapist testified that initially he was uncooperative in counseling sessions, but had substantially improved in the two months preceding the hearing. She testified that he was being "open-minded" and "putting into practice the anger management that we have been going over." She testified that he called in for sessions when he was out of town working, even when his insurance would not cover it.

improvement period.[9] The worker who supervised petitioners' visitation testified that no visits were cancelled and that all interactions were familial and affectionate.

Nevertheless, the DHHR caseworker testified that it was in the children's best interest to remain in the custody of the DHHR. In support, she stated that the children advised her that their parents argued in front of them; however, she further testified that the kids loved their parents and had a strong bond with them. She noted that in petitioners' "provider reports" that Matthew H. had threatened the lives of "everyone in the case." The guardian ad litem likewise argued in support of termination, stating to the court that the petitioners had failed to take responsibility for the acts giving rise to the proceedings and simply "didn't get it."

The DHHR representative was further critical of April B. because she had "remained in the relationship with Matthew." She conceded April B. had successfully completed services, but "she continues to maintain contact and live in the same residence where there's emotional, psychological violence and even physical violence that was

---

[9] The DHHR worker testified that Matthew H. had attended twenty-five out of thirty-two batterers' intervention sessions as well as counseling and psychiatric appointments. She was critical of his failure to attend the final seven sessions of batterers' intervention, but testified that he had obtained employment in Pennsylvania and that the program could not accommodate his travel schedule. Petitioners testified that they attempted to coordinate an alternate program in Pennsylvania where he could complete the sessions, but were unsuccessful.

9

reported[.]" [10]    However, April B. testified that she remained committed to her relationship with Matthew H., but "if it comes to the point between him and my children, of course, I would choose my children." Critically, when pressed on why she had not previously acted on her willingness to leave Matthew H., she responded that "[a]s of the last MDT meeting, we were all under the impression that you were sending the kids home" and "there was hope that we would still be a family unit and not a broken family." She testified that the CPS worker told her "our goal at CPS is to reunite the family, not break the family up."[11]

---

[10] There is no indication in the appendix record of any evidence of physical violence between April B. and Matthew H.

[11] The appendix does not contain any documents reflecting the family case plan established, nor is the content of it mentioned in any of the hearing transcripts. Although we find it unnecessary to assess the petitioners' compliance with their improvement period, as discussed *infra,* we note that April B.'s testimony suggests that the family case plan did not set forth the requirement that April B. leave Matthew H. Certainly, the requirements of the improvement period as set forth in the circuit court's order included no such directive.

As such, we note that in this case, it appears that to the extent successful completion of April B.'s improvement period was conditioned on her termination of her relationship with Matthew H., such requirement was not clearly expressed to her. The clear expression of the meaningful steps required of a parent to successfully complete his or her improvement period is

> designed to foreclose a natural parent from being placed in an amphorous [sic] improvement period where there are no detailed standards by which the improvement steps can be measured. It also provides a meaningful blueprint that the DHS can monitor and which will also give the court specific

(continued . . .)

Following this testimony, the circuit court terminated the petitioners' parental rights. The court noted that April B. appeared physically intimated and fearful of Matthew H., but that she was wholly unwilling to do anything to separate herself from his behavior.[12] The court indicated that she had "several opportunities during the course of this case" to leave Matthew H. but had not done so. The court found that Matthew H. wanted to "blame everybody but himself." As a result, the circuit court found that there were no "reasonable grounds that the conditions out of which this abuse and neglect arose, can or will be corrected within the foreseeable future[.]" This appeal followed.

---

> information to determine whether the terms of the improvement period were met.

*State ex rel. West Virginia Department of Human Services v. Cheryl M.*, 177 W. Va. 688, 693-94, 356 S.E.2d 181, 186-87 (1987).

[12] The court stated:

> I have never seen a witness that physically appeared to be any more intimidated or fearful of someone than the respondent mother does to the respondent father in this case, but I also have never seen anyone . . . less willing to accept that issue and to correct that situation.

In spite of this finding, the circuit court at no time undertook an analysis of whether April B. was a "battered parent" as defined by West Virginia Code § 49-1-3(3) (2011) and therefore to be afforded such treatment as a "battered parent" with regard to adjudication and disposition.

11

## II. STANDARD OF REVIEW

This Court has held, with regard to our review of abuse and neglect findings:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). With these principles in mind, we turn to the petitioners' assignments of error.

## III. DISCUSSION

*Adjudication*

Petitioner Matthew H. asserts that the circuit court erred in adjudicating him abusive and/or neglectful because he merely acted in self-defense during the altercation, which he contends was instigated by Randy B. Petitioner April B. adopts a similar argument and contends that, for her part, she was merely attempting to break up the altercation. Both parties contend that the children "ventured" from the home

12

unbeknownst to them. The DHHR counters that it was Matthew H. who instigated the fight by gesturing to Randy B. and then refusing to "stand down" when the fight escalated. The DHHR takes the position that April B. chose to protect Matthew H. rather than her children in attempting to intervene in the altercation. The guardian ad litem essentially argues simply that domestic violence occurred in front of the children and is therefore *per se* abuse and/or neglect.

Although the circuit court did not identify the statutory basis for its adjudication and referred simply to the children as being "abused and/or neglected," it presumably based its adjudication on West Virginia Code § 49-1-3(1)(D) (2011), which defines an "abused child" as one "whose health or welfare is harmed or threatened by . . . [d]omestic violence as defined in section two hundred two [§ 48-27-202] article twenty-seven, chapter forty-eight of this code." West Virginia Code § 48-27-202 (2010) defines "domestic violence," as the "occurrence of one or more of the following acts between family or household members," which "acts" include "[a]ttempting to cause or intentionally, knowingly or recklessly causing physical harm to another[.]"[13] Upon determining that Matthew H. abused the children by subjecting them to "domestic

---

[13] West Virginia Code § 48-27-204 (2002) provides the operative definition of "family or household members." The circuit court, however, did not undertake an analysis of the statutory definition to ensure that the statute contemplated the relationship between Randy B. and Matthew H.; nonetheless, they do appear to qualify as "family or household members" by operation of West Virginia Code § 48-27-204(8).

violence," the circuit court ostensibly then derived April B.'s adjudication from the following:

> W. Va. Code, 49–1–3(a) (1984), in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent.

Syl. Pt. 3, *In re Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988).

Although this Court does have concerns about the health and welfare of the subject children as discussed more fully *infra,* we are nonetheless left with the firm conviction that the circuit court's finding that the children were abused and/or neglected because they witnessed the altercation between their father and grandfather was clearly erroneous. We reach this conclusion without delving into the genuine dispute between the parties as to which combatant is most "at fault" for having instigated the altercation. Rather, we find that this unfortunate, yet isolated occurrence, was not sufficient to constitute abuse and/or neglect on the part of Matthew H., nor was the fact that the children witnessed this occurrence sufficient to constitute abuse and/or neglect on the part of April B. Moreover, during oral argument in this matter, counsel represented that the children are currently placed with Randy B., the fellow combatant and alleged aggressor which gave rise to the adjudication. We can discern no conceivable justice in stripping petitioners of their children for certain behaviors, only to place the children with another who engaged in precisely the same conduct.

14

While this Court is quick to note that we are disturbed by and strongly disapprove of all three combatants' behavior and seeming disregard for the proximity of small children to their exchange, we find that the circumstances of this particular case are simply too attenuated from the type of household domestic violence from which an abuse and neglect adjudication may derive. To that end, although the altercation may definitionally qualify as "domestic violence" under West Virginia Code § 48-27-202, we note that Randy B. did not reside in the household with Matthew H. and the children; as such, the children's exposure to their vitriol was limited. Randy B. testified that April B. had severely restricted his interaction with the family as a direct result of the animosity. We find that, although both Matthew H. and Randy B. testified to a history of verbal altercations and threats, the record is devoid of any evidence of prior, much less recurrent, physical violence between them. Although previous verbal incidents—at least one of which involved Randy B.—were cursorily alleged in the petition, the DHHR noted that such allegations were unsubstantiated.

With respect to April B., we simply cannot find that her actions, in attempting to intervene and thereby becoming involved in the altercation is tantamount to "aid[ing] or protect[ing]" Matthew H. or constitutes neglect of her children. While cooler heads would certainly indicate that a wiser course would have been to call the police, we cannot say that she neglected her children by choosing in the heat of the moment to attempt to bring the altercation—bearing witness to which the circuit court found caused the children emotional harm—to an end. We find no evidence that petitioners knowingly

15

subjected the children to this incident, despite the strong likelihood that, as children, they may venture outdoors, curious about the commotion.  Finally, we believe the unexpected and isolated nature of this event is underscored by petitioners' efforts to ensure that such an event did not recur by obtaining a DVP against Randy B.

This is not to say, however, that the children were not disturbed by witnessing the altercation and that the contentious relationship between their father and grandfather is not a constant source of anxiety and concern to them.  However, neither parents, nor the courts through exercise of the State's *parens patriae* powers, can ensure a childhood experience entirely free from emotional upset and occasional unpleasantness which obtains from the complexities of human relationships.  We simply cannot agree, under these particular circumstances, that the petitioners created an environment of abuse and/or neglect which threatened their children's health or welfare sufficient to justify their adjudication as abusive and/or neglectful.

In difficult cases such as this, we have often reminded lower courts that

> [i]n the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).  While we do not lightly—and seldom do—disturb the results of the lower courts' Herculean efforts to

16

balance the safety and well-being of children, while protecting parents' fundamental rights, this case leaves us with the firm conviction that the circuit court clearly erred in its finding of abuse and/or neglect and we therefore reverse the court's October 3, 2011, order to that effect.

*Disposition*

Having determined the circuit court's adjudication to be error, it is procedurally unnecessary to determine whether the circuit court likewise erred in terminating the petitioners' parental rights. Nevertheless, we write further to address the troubling development of this case—both factually and legally. This Court cannot turn a blind eye toward the abuse and neglect allegations which lurk in the periphery of this matter, merely because they evaded proper handling below. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). *See also State v. Julie G.*, 201 W. Va. 764, 776, 500 S.E.2d 877, 889 (1997) (Workman, C. J., dissenting) ("Courts are [] statutorily reposed with a strong obligation to oversee and protect each child who comes before them."). Our review of this matter reveals that the DHHR failed to properly amend the petition prior to adjudication and the circuit court failed to permit proper amendment post-adjudication, such as to encompass all of the allegations made evident during the course of the proceeding. Furthermore, we find that the circuit court's analysis and findings in support of the disposition were deficient. These errors are of

17

such a nature and magnitude such as to render the proceedings below a failure of their essential purpose.

### 1. Failure to Amend Petition

We observe that the petitioners' second assignment of error regarding the circuit court's termination of their parental rights, merely circles around, but does not identify, the most problematic aspect of the court's disposition. Petitioners contend that the circuit court erred in terminating their parental rights because they successfully completed their improvement periods. Whether or not that is the case, this Court declines to address, as noted above. However, this Court takes notice of the plain error permeating the disposition wherein the circuit court terminated the parental rights on the basis of allegations and issues which were never properly made subject of the adjudication. "[I]t is within the authority of this Court to 'sua sponte, in the interest of justice, notice plain error.'" *Cartwright v. McComas*, 223 W. Va. 161, 164, 672 S.E.2d 297, 300 (2008) (quoting Syl. Pt. 1, in part, *State v. Myers,* 204 W.Va. 449, 513 S.E.2d 676 (1998)). We find that this error was occasioned by the circuit court's erroneous reading and application of the Rules of Procedure for Child Abuse and Neglect Proceedings regarding amendments to petitions, as well as the DHHR's lack of diligence with respect to additional abuse and neglect issues. To that end,

> [w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has

18

been substantially disregarded or frustrated, the . . . case [will be] remanded for compliance with that process[.]

Syl. Pt. 5, in part, *In re Edward B.*, 210 W.Va. 621, 558 S.E.2d 620 (2001).

Rule 19 of the Rules of Procedure for Child Abuse and Neglect governs amendments to petitions and provided, at the time of this adjudication, that petitions may be amended at any time until the final adjudicatory hearing, provided that the adverse party was granted sufficient time to respond to the amendment. Critically, Rule 19 further provided that "[a]fter the final adjudicatory hearing begins, a petition *may be amended* if the amendment does not prejudice an adverse party." (emphasis added). During the course of the proceedings below—following adjudication, but prior to disposition—Rule 19 was amended to, in part, provide further direction to circuit courts in dealing with post-adjudicatory amendments. The Rule now reads, in pertinent part:

> (b) *Amendments after the adjudicatory hearing.* – If new allegations arise after the final adjudicatory hearing, the allegations should be included in an amended petition rather than in a separate petition in a new civil action, and the final adjudicatory hearing shall be re-opened for the purpose of hearing evidence on the new allegations in the amended petition. [14]

---

[14] It should be noted that this amendment merely provides further *procedural* guidance to the circuit court in handling new allegations, i.e. such allegations may be addressed by way of amended petition and re-opening the adjudication, rather than requiring a new action to be filed. In no way does the amendment set forth a "new" requirement that post-adjudicatory allegations must be acknowledged and properly, systematically adjudicated. Any interpretation that Rule 19 previously suggested that post-adjudicatory allegations must simply be disregarded if prejudice would result from their inclusion in the pending proceeding is wildly inconsistent with the "clear language (continued . . .)

19

West Virginia Rules of Procedure for Child Abuse and Neglect (2012) (footnote added).

In the case below, the guardian ad litem moved to compel the DHHR to amend its petition to include allegations regarding the condition of the children and the home; the circuit court summarily found that such amendment could not occur post-adjudication, in clear contravention of Rule 19, even as it then existed. The circuit court reached this conclusion despite counsel for both petitioners conceding that they were not prejudiced by the court's consideration of such evidence for purposes of disposition. *See* n.6, *infra.* Accordingly, the record is devoid of anything but the initial, troubling evidence regarding the hygiene of the children and unsanitary condition of the home adduced during the preliminary hearing; at the adjudicatory hearing, the parents had moved into a home that the DHHR had not inspected. The DHHR caseworker testified that she believed the condition of the home was serious enough to include in the petition, yet the circuit court did not permit amendment of the petition, nor, more importantly, base any portion of his adjudication on those allegations. Subsequent thereto, there is absolutely no reference to whether proper care and treatment which *directly affected the physical well being of the subject children* was an ongoing concern. As such, these troubling allegations wholly eluded meaningful adjudication and commensurate attention during the improvement period.

---

and substantive tenor of abuse and neglect law[.]" *Julie G.,* 201 W. Va. at 776, 500 S.E.2d at 889 (1997) (Workman, C. J., dissenting).

However, despite our concern regarding the neglect allegations regarding the children and the home which "fell through the cracks" due to the circuit court's erroneous handling of the requested amendment, we are most startled by the fact that at no time did the DHHR, the guardian ad litem, or the circuit court even discuss the necessity of amending the subject petition to include the *relationship between the petitioners* as a part of the subject adjudication. April B. and Matthew H.'s contentious relationship overwhelmed the evidence regarding their improvement period and formed the *sole* basis of the court's termination of their parental rights. Yet, at no time did the circuit court make a finding that their interactions, while unsettling, rose to the level of "domestic violence" pursuant to West Virginia Code § 48-27-202, such as to render the children "abused children" pursuant to West Virginia Code § 49-1-3(1)(D). Rather, the circuit court made its erroneous threshold finding that the altercation between Matthew H. and Randy B. rendered the children abused and neglected, then insinuated itself into the quarrelsome relationship between April B. and Matthew H. The circuit court then terminated their parental rights on the basis of their continued acrimony, which was never even alleged to constitute abuse and/or neglect in the petition or at any time during the proceedings. This action served to "back door" adjudication. *See* Syl. Pt. 2, *Julie G.,* 201 W. Va. 764, 500 S.E.2d 877 (limiting basis of adjudication to conditions existing at time of, and as alleged in, the petition); *cf.* Syl. Pt. 6, *In re Carlita B.,* 185 W. Va. 613, 408

21

S.E.2d 365 (1991) (requiring court, at conclusion of improvement period, to determine if sufficient improvement has been made in context of all circumstances of case).[15]

To that end, this Court has provided clear guidance to courts on their authority, if not *obligation*, to compel newly-discovered or developed abuse and neglect allegations to be made part of a petition:

> To facilitate the prompt, fair and thorough resolution of abuse and neglect actions, if, in the course of a child abuse and/or neglect proceeding, a circuit court discerns from the evidence or allegations presented that reasonable cause exists to believe that additional abuse or neglect has occurred or is imminent which is not encompassed by the allegations contained in the Department of Health and Human Resource's petition, then pursuant to Rule 19 of the *Rules of Procedure for Child Abuse and Neglect Proceedings* [1997] the circuit court has the inherent authority to compel the Department to amend its petition to encompass the evidence or allegations.

Syl. Pt. 5, *In re Randy H.*, 220 W.Va. 122, 640 S.E.2d 185 (2006). In *Randy H.*, we found that the circuit court had the authority to compel the DHHR to investigate allegations which arose post-petition and "a duty to make findings of fact and conclusions of law regarding those allegations." *Id.* at 127, 640 S.E.2d at 190; *see also In re T.W.*, 230 W.Va. 172, 737 S.E.2d 69 (2012).

---

[15] *See also Julie G.*, 201 W. Va. at 776, 500 S.E.2d at 889 (Workman, C. J., dissenting) ("While . . . evidence concerning matters not alleged in the original petition [may not] alone support an adjudication of abuse and neglect absent an amendment, such evidence is clearly relevant insofar as it would 'tend[] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable[.]'" (citing W.V.R.E. 401)).

22

It is clear to this Court that there remain unaddressed issues within this family that, due to a confluence of errors, were not appropriately adjudicated. These issues obviously include, but may not be limited to, whether the petitioners cared for the children and their home in a manner which ensured their safety and welfare, and further whether their volatile relationship constitutes "domestic violence" sufficient to render the children abused as a result of their exposure thereto. As described above, none of these concerning allegations were ever properly adjudicated; the purported "domestic violence" between the petitioners arose seemingly out of thin air at some point in the proceedings as the underpinning of the abuse and neglect petition. This Court has recently held:

> In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child.

Syl. Pt. 6, *In re: Timber M. and Reuben M.*, No. 12-1138 (W. Va. June 5, 2013).

Accordingly, upon remand, the DHHR is directed to file an amended petition, if appropriate, to include any and all allegations which it believes threaten the health or welfare of these children, to the extent that adequate grounds exist for such amendment. To the extent an adequate basis exists, such amendment should include but is not limited to any alleged "domestic violence" between the petitioners, allegations of neglect of the children and/or the petitioners' home, and any additional allegations which may have developed during the course of these proceedings. Further, the circuit court is

23

directed to hold proceedings immediately upon remand for purposes of restoring custody to petitioners. However, before the children are returned to petitioners, in light of the Court's foregoing concerns, the circuit court is directed to 1) undertake any measures necessary to preliminarily ensure that Matthew H. and April B. can currently provide the children with a fit and suitable home; and 2) address the most recent substance abuse allegations against Matthew H., including but not limited to any drug testing protocols it deems necessary pending further proceedings, if any.

2. Deficiencies in Dispositional Findings

Finally, in review of the circuit court's disposition and order, we are once again compelled to remind courts that "[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948). We note that the circuit court's disposition order appears largely perfunctory[16] and further that the disposition hearing was geared more toward castigating and punishing the petitioners rather than engaging in any meaningful analysis of the best interests of the children. The failure of this most critical analysis is mirrored in the deficiencies contained in the order itself.

---

[16] In particular, most of the orders entered in this matter appear to have been assembled *pro forma* and are lacking in supporting findings. Most critically, however, the disposition order contains no particularized factual findings regarding the improvement period and makes only conclusory statements to partially attempt to track the language of West Virginia Code § 49-6-5(a)(6) (2011), as discussed more fully *infra*.

This Court has held:

> Where a trial court order terminating parental rights merely declares that there is no reasonable likelihood that a parent can eliminate the conditions of neglect, without explicitly stating factual findings in the order or on the record supporting such conclusion, and fails to state statutory findings required by West Virginia Code § 49–6–5(a)(6) (1998) (Repl. Vol. 2001) on the record or in the order, the order is inadequate.

Syl. Pt. 4, in part, *In re Edward B*., 210 W. Va. 621, 558 S.E.2d 620. We note that the disposition order only summarily states that "there is no reasonable likelihood that the condition of neglect or abuse can be substantially corrected in the near future,"[17] with no findings in support of this critical conclusion. Moreover, the remaining findings required by West Virginia Code § 49-6-5(a)(6) are entirely absent including: 1) why continuation in the home is not in the best interests of the children; 2) why reunification is not in the best interests of the children; and 3) a description of the efforts made by the DHHR to preserve and reunify the family.[18] We again caution the circuit courts that "[t]ermination of parental rights [is] the most drastic remedy under the statutory provision covering the

---

[17] We recognize that the transcript of the disposition hearing contained slightly more detail than the disposition order, but note that the circuit court's conclusions were still lacking in factual findings and support. *But see In re Jamie Nicole H*., 205 W. Va. 176, 517 S.E.2d 41 (1999) (upholding termination where transcript, rather than order, supported finding that there was no reasonable likelihood conditions could be corrected).

[18] The circuit court's findings in this particular regard would have proven helpful given the testimony given by the DHHR caseworker regarding April B.'s failure to leave Matthew H.

25

disposition of neglected children" and must be supported by adequate findings. Syl. Pt. 2, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980). The statutory requirements are designed to ensure that this most serious remedy is adequately justified and not utilized improvidently.

## IV.  CONCLUSION

Based upon the foregoing, we reverse the October 3, 2011 and September 12, 2012, orders of the Circuit Court of Gilmer County and remand this matter for amendment of the petition, as appropriate, and further proceedings consistent with this opinion.

Reversed and remanded with directions.